**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JATONYA CLAYBORN MULDROW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  4:18-CV-02150-AGF |
| | ) | |
| CITY OF ST. LOUIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court on Defendant City of St. Louis and Defendant Michael Deeba's motion for summary judgment.  (Doc. No. 38).  Plaintiff Jatonya Clayborn Muldrow, a female St. Louis Police Officer, alleges that Defendant City of St. Louis discriminated and retaliated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.  In addition,  Plaintiff alleges that both Defendants discriminated and retaliated against her based on her sex in violation of the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010, et seq.  For the reasons set forth below, the Court will grant Defendants' motion as to Plaintiff's Title VII claims against Defendant City.  Because the Court declines to exercise supplemental jurisdiction over the remaining state law claims, those claims will be dismissed without prejudice.

## BACKGROUND

Unless otherwise indicated, the facts set forth below are undisputed.  Plaintiff is a police officer with the rank of sergeant who, at all relevant times, worked for the St. Louis Metropolitan Police Department.  In January 14, 2008, Plaintiff was assigned to work in the Department's Intelligence Division (hereinafter, "Intelligence") where she remained, with one short exception,[1] until June 12, 2017.  During Plaintiff's time in Intelligence, she worked on matters related to public corruption and human trafficking, served as the head of the Gun Crimes Intelligence Unit, and, at one point, oversaw the division's Gang Unit.  While working in Intelligence, Plaintiff had the ability to work straight eight-hour days; had weekends off; and had an unmarked take-home car.

In 2016, Plaintiff was deputized as a Task Force Officer (hereinafter, "TFO") for the Human Trafficking Unit of the Federal Bureau of Investigation.  As a TFO, Plaintiff was given the rights and privileges of an FBI agent—including access to the FBI field office and databases—along with the ability to work in plain clothes; an unmarked FBI-owned vehicle for human trafficking investigations; an FBI identification badge; and the freedom to pursue human trafficking investigations outside of St. Louis City.  As a TFO, Plaintiff could also earn up to $17,500 working overtime for the FBI.

Starting in 2017, Plaintiff asserts that Defendants violated the MHRA and Title VII by: (1) transferring her out of Intelligence; (2) causing her TFO status to be revoked; (3) refusing to transfer her to or hire her for positions in the Second District; and (4)

---

[1] Plaintiff was transferred for a brief time to work in District Four from March 31, 2014 through September 22, 2014.  She was then transferred back to the Intelligence Division.

refusing to hire her for an Internal Affairs Division (hereinafter, "IAD") position.  The following background is organized around those events.

## I.      Plaintiff's Transfer Out of Intelligence

In April of 2017, Interim Police Commissioner Lawrence O'Toole replaced the then Commander of Intelligence—Captain Angela Coonce—with Defendant Captain Deeba.  Prior to his transfer to Intelligence, Capt. Deeba had not previously worked with Plaintiff or had any meaningful interactions with her.  Capt. Coonce had a good working relationship with Capt. Deeba and, once he took over, she had a conversation with him in which she positively discussed Plaintiff.  Capt. Coonce told Capt. Deeba that Plaintiff was a "workhorse" and that, if there was one sergeant he could count on in the Division, it would be Plaintiff because of her experience.  Plaintiff later ran into Capt. Coonce at a social event following Capt. Deeba's transfer to the division, during which Capt. Coonce asked Plaintiff how things were going.  In response, Plaintiff said that things were fine but complained that Capt. Deeba had been continuously referring to her as "Mrs.," rather than by her rank.[2]

Comm'r O'Toole had told Capt. Deeba that he wanted Intelligence to be a more proactive unit focused on street work and, to that end, Capt. Deeba requested permission from Comm'r O'Toole to make personnel changes soon after taking control.  As part of

---

[2] Defendants do not dispute that Capt. Deeba referred to Plaintiff using the "Mrs." salutation, but do dispute that he called her this frequently as Plaintiff could only identify one specific instance when this occurred.  For the purposes of this motion, in which the Court is required to draw all reasonable inferences in Plaintiff's favor, the Court will accept Plaintiff's assertion as true.

his request, Capt. Deeba recommended that Plaintiff be transferred out of Intelligence and, in exchange, Sergeant Ray Jackson be detached to work under Capt. Deeba's command.  Capt. Deeba wanted to bring in Sgt. Jackson because he had worked with him for twenty years and believed he would be a good fit to oversee the "very dangerous work" of street operations while he reorganized Intelligence to focus on violent crime. Capt. Deeba's request to have a particular officer with whom he had a good working relationship was not an unordinary request; in fact, it was common for captains to request that certain officers be detached to work under them.  Before making the transfer, Capt. Deeba had not discussed Plaintiff's street work experience with her, nor formed an opinion about whether she was capable of handling a role focused on proactive street operations.[3]

Ultimately, Comm'r O'Toole—who had no personal knowledge of Plaintiff but had previously heard positive things about her—approved Capt. Deeba's request to transfer Plaintiff.  In a mass email sent out to the St. Louis Metropolitan Police Department on June 9, 2017, Comm'r O'Toole noted that Plaintiff would be transferred to the Fifth District starting on June 12, 2017.  Comm'r O'Toole decided to transfer Plaintiff to the Fifth District for no other reason than the district was short a sergeant according to the manning tables.  As a result of Plaintiff's transfer to the Fifth District, she was required to work on a rotating schedule; was assigned to a contained patrol area and could no longer travel outside of her district to perform job responsibilities; and was

---

[3] (Deposition of Michael Deeba, Doc. No. 39-3 at pp. 30-31).

required to patrol in uniform with a marked police car.[4]  In the Fifth District, Plaintiff was responsible for, among other things, administrative upkeep of the personnel assigned to her, supervising officers on patrol, and responding to Code 1 calls for service (which included robberies, assault first, homicide, and home invasions), and reviewing and approving arrests.[5]

On the same day and in the same email, several other department wide personnel transfers were also announced.  Seventeen men and five women of varying ranks were transferred or detached from different units, including three police officers who were also transferred out of Intelligence:  Keaton Strong, a male officer; Tonya Rodman, a female officer, and Lafael Lawshea, a male officer.  During the personnel transfers, Capt. Deeba retained two female police officers within Intelligence to work in administrative roles.

## II.    The Revocation of Plaintiff's TFO Status

Following Plaintiff's transfer, she was also no longer responsible for human trafficking investigations.  As such, she immediately informed her human trafficking

---

[4] Plaintiff asserted that she was denied the ability to "receive additional training." However, Defendants have shown that Plaintiff took several training courses while she was in the Fifth District.  (Plaintiff's Personnel File, Doc. No. 51-34 at 4).  To the extent that Plaintiff is referring to training outside of the Department, she does not specify what those trainings are.  Plaintiff's conclusory assertions that she was denied trainings cannot be used to create a genuine dispute of material fact.  *See Armour & Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993) (conclusory statements without support in the record are insufficient to defeat summary judgment).

[5] Plaintiff asserted that her responsibilities in the Fifth District were limited to administrative upkeep and supervising officers on patrol.  However, Defendants have cited to sections of Plaintiff's deposition that show her responsibilities in the Fifth District were more expansive.  (Plaintiff's Deposition, Doc. No. 39-2 at 13; Doc. No. 55-1 at 2).  Those larger responsibilities are thus reflected.

contacts within the FBI that she had been moved to the Fifth District and that they would need to reach out to Intelligence to see who their new point of contact would be.  Plaintiff did not make any arrangements to return her FBI vehicle or her FBI credentials.

On June 14, 2017, Capt. Deeba became aware that Plaintiff had not yet returned her FBI vehicle.  Capt. Deeba instructed a lieutenant in Intelligence to create a list for him of all FBI TFO vehicles currently assigned to police officers for his reference.  Capt. Deeba then proceeded to call the FBI to certify that Plaintiff had not yet turned in her vehicle.  Capt. Deeba spoke with Plaintiff's FBI supervisor, Special Agent Lynch. Following the phone call, Capt. Deeba summarized the conversation he had with Agent Lynch in an email he sent to her later that same day.  According to the email, he asked Agent Lynch to ensure that the Plaintiff's FBI vehicle was returned and to contact him upon completion.  He also informed her that whenever an officer was transferred out of a specialized unit, such as Intelligence, that all FBI equipment should be turned in and any clearances should be made inactive.  At the end of the email, he referenced Agent Lynch's "concern . . . with current ongoing investigations involving [Plaintiff]" and informed Agent Lynch that Plaintiff was now under the command of the Fifth District's Captain and that she should "communicate with him for investigative needs requiring [Plaintiff's] involvement moving forward with pending cases."[6]

---

[6] Plaintiff disputes that Capt. Deeba's email accurately captured what was said during the phone call between him and Agent Lynch.  Specifically, Plaintiff asserts that during the phone call Capt. Deeba falsely told Agent Lynch that only officers working in Intelligence were allowed to retain their TFO status and that he demanded that Agent Lynch revoke Plaintiff's TFO credentials.  In support, Plaintiff cites to her deposition where she discussed a phone call she had with Agent Lynch the same day Agent Lynch

Later that day, Capt. Deeba called Plaintiff and told her that she needed to return her FBI vehicle and credentials and that he had discussed the need to return these items both to Agent Lynch and Agent Lynch's supervisor.  In addition to calling Plaintiff, Capt. Deeba called her Fifth District supervisor, Capt. Larson, to let him know that she had not returned the equipment after her transfer.  That day, Capt. Larson found Plaintiff and told her he had received a call from Capt. Deeba about the missing equipment.  Plaintiff was embarrassed and ended up crying in front of Capt. Larson.

Plaintiff returned all of her FBI equipment, including her vehicle and her badge, that day.  There is no evidence that Agent Lynch or anyone from the FBI ever reached out to Plaintiff's Fifth District supervisor or anyone else at the Department to request

---

spoke with Capt. Deeba.  Plaintiff alleges that, during that phone call, Agent Lynch told Plaintiff what was said during the conversation between her and Capt. Deeba.

Defendants, citing to Capt. Deeba's deposition and the summarized email of his phone call, contend that Capt. Deeba did not tell Agent Lynch to revoke Plaintiff's credentials and that, to the contrary, he gave her the contact information for Plaintiff's new supervisor in case she wanted to request Plaintiff's help with ongoing investigations. Defendants further object to Plaintiff's evidence—specifically, what Agent Lynch said during an alleged phone call with Plaintiff—as inadmissible hearsay under Rule 56(c). Fed. R. of Civ. P. 56(c)(2); Fed. R. of Evid. 801.  Neither party ever deposed Agent Lynch and there are no sworn statements from her within the record.  Plaintiff did not explain why these statements were admissible.

The Court agrees with Defendants that Plaintiff's retelling of Agent Lynch's conversation with Capt. Deeba is inadmissible hearsay and, as such, cannot be used to create a genuine issue of fact.  *See Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001) ("While we review the record in the light most favorable to . . . the non-moving party, we do not stretch this favorable presumption so far as to consider as evidence statements found only in inadmissible hearsay.").

permission for Plaintiff to work on ongoing human trafficking cases.  The FBI eventually revoked Plaintiff's TFO status.

At the same time Plaintiff was transferred out of Intelligence, another male TFO—Officer Lafael Lawshea—was transferred out of Intelligence and to the Sixth District. Off. Lawshea had been in the process of receiving his federal credentials as a TFO for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (hereinafter, "ATF") when his transfer occurred.  Off. Lawshea had received his "PIV" card,[7] but had not yet received his badge or other equipment from ATF.  He had also not begun working on any ATF cases as a TFO.[8]  Following his transfer, he was contacted by his ATF supervisor who told him to retain whatever ATF credentials he had received and that, if he was interested, he could work overtime on ATF matters.  Soon after Off. Lawshea was transferred, however, he was switched onto a straight night schedule in the Sixth District that would have made working overtime too challenging.  A month or two following his transfer he told his ATF supervisor that he would be unable to work overtime and his TFO status was subsequently revoked.

---

[7] A Personal Identification Verification card is a Federal governmentwide credential used to access Federally controlled facilities and information systems at the appropriate security level.

[8] Plaintiff disputes that Off. Lawshea was not working on any cases as a TFO when he was transferred.  However, Plaintiff has no first-hand knowledge of his work, and Plaintiff's assertion is directly refuted by Off. Lawshea's deposition in which he stated he had worked on ATF cases starting in 2016 but had not yet begun working them as "a full Task Force Officer."  (Deposition of Lafeal Lawshea, Doc. No. 39-10, Tr. 11:5-14).

At no point after Off. Lawshea's transfer was he contacted by Capt. Deeba or anyone in the St. Louis Metropolitan Police Department to ensure he had returned any equipment associated with the ATF.  Although Capt. Deeba did enlist a lieutenant to see through returns of the outstanding FBI vehicles, Capt. Deeba did not himself make phone calls to see through the return of equipment from anyone other than Plaintiff.

### III.    Plaintiff is Not Transferred to the Second District

### A. Capt. Coonce requests Plaintiff be made her administrative aid in the second district.

Shortly after Plaintiff's transfer to the Fifth District, Capt. Coonce—who had been transferred from Intelligence to the Second District—decided to request that Plaintiff be moved to the Second District to be her administrative aide.  Because captains are typically allowed to choose their administrative aid, Capt. Coonce  had two informal conversations up her chain of command during which she requested that Plaintiff be transferred to work under her.[9]  In her deposition, Capt. Coonce claimed that she first discussed the transfer with Major Howard who told her it "wasn't going to happen" and that "they" were not going to let Capt. Coonce have Plaintiff. [10]  Capt. Coonce then spoke

---

[9] Neither Maj. Howard nor Col. Leyshock stated they remembered having this conversation with Capt. Coonce.  The Court, taking all reasonable inferences in favor of Plaintiff, will assume the conversation occurred as described by Capt. Coonce.

[10] Defendants argue that the statements made by Maj. Howard are inadmissible hearsay and thus cannot be considered for the purposes of summary judgment.  However, the statements were made by an employee of St. Louis City on a matter within the scope of their relationship (i.e., discussing employee transfers within the department).  As such, it is not hearsay under Fed. R. Evid. 801(d)(2)(C).

to Colonel Leyshock and requested Plaintiff's transfer.  Similarly, Col. Leyshock  said

something to the effect of "they are not going to let you have her."  Capt. Coonce never

made a formal request in writing for Plaintiff to become her aid, and there is no evidence

that the request ever reached Comm'r O'Toole's office.[11]  Capt. Coonce told Plaintiff

within a week of her transfer to the Fifth District that she was not going to be able to

become her administrative aid.

On June 22, 2017, Plaintiff filed her charge of discrimination with the Missouri

Commission on Human Rights (hereinafter, "Charge"), alleging that the City and Capt.

Deeba had discriminated against her by causing her TFO status to be revoked.  Notice of

the Charge was provided on June 27, 2017, and both Comm'r O'Toole and Capt. Deeba

were made aware and reviewed the Charge.

## B.  Plaintiff's requests for transfer and application to a position in the Second District.

Around the time Plaintiff was transferred, there was a problematic shortage of

sergeants in the Second District, in part, because a number of sergeants were out on long-

term medical leave.  Being aware of that shortage, Plaintiff submitted an entry in

PeopleSoft—a software management system used by the Department—requesting a

---

[11] Plaintiff argues that "an inference can be made that there was some discussion" between Col. Leyshock, Maj. Howard, and Comm'r O'Toole about Plaintiff not getting the administrative aid position based on Col. Leyshock and Maj. Howard's statements to Capt. Coonce.  (Doc. No. 51 at 22).  However, speculation cannot be used to create a genuine issue as to whether Comm'r O'Toole was ever made aware of Capt. Coonce's request.  *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) ("While we are required to make all reasonable inferences in favor of the nonmoving party in considering summary judgement, we do so without resort to speculation.").

transfer to the Second District on July 5, 2017, and notified Capt. Coonce that she had made the request.  By submitting a transfer request on PeopleSoft, Plaintiff was added to a list of employees interested in a transfer that command staff could check by running a report or reviewing a weekly report that was provided to them.  Plaintiff did not, however, submit a formal transfer request, which would have required her to submit a memorandum up her chain of command asking for transfer. [12]

Eventually, due to the severity of the shortage, Capt. Coonce sent an email to her supervisor Maj. Howard informing him that the shortage was "at critical mass" and requested transferring one of her detective sergeants—who was planning on using his sick leave until he retired in January—so that he could be replaced.  On July 13, 2020, Maj. Howard asked Col. Leyshock's permission to post the detective sergeant position for the Second District and Col. Leyschock agreed to forward the job posting to Human Resources.  The position was posted on July 14, 2020.  Capt. Coonce, Maj. Howard, and Col. Leyshock were apparently unaware, however, that the Department does not allow officers to be transferred out of their positions due to being out on sick leave.  As a result, the position was posted even though the current sergeant could not be transferred out to make the position vacant.

---

[12]  Plaintiff characterized this PeopleSoft entry as a "formal request to transfer."  (Doc. No. 55, at 10).  Defendants, however, have provided a Special Order from the Department that describes how officers can apply for transfer.  (Doc. No. 55-7).  According to the Order, officers are required to send a memorandum within their chain of command.  As such, the Court does not credit Plaintiff's conclusory assertions—supported only by her own deposition—that the PeopleSoft entry was a "formal request to transfer." *See Armour & Co., Inc.*, 2 F.3d at 279 (8th Cir. 1993).

Sergeant Bottini, the Commissioner's aide, was not made aware of the request before it was posted, and Comm'r O'Toole had not given his approval before the posting went live.  Comm'r O'Toole told Sgt. Bottini that he would speak to Col. Leyshock about the posting, but ultimately never instructed Sgt. Bottini to remove it.

Plaintiff applied for the detective sergeant position in the Second District on July 26, 2017.  Interviews were conducted, and Capt. Coonce ultimately selected Plaintiff to fill the position.  Capt. Coonce's supervisors, Maj. Howard and Col. Leyschock, both questioned Capt. Coonce about her selection and told her that, by choosing Plaintiff, the position may not be filled.[13]  Maj. Howard and Col. Leyschock also encouraged her to send a second recommendation for the position in case Plaintiff was not accepted for transfer, which was something Capt. Coonce had never before been told to include, nor done of her own volition.  She subsequently listed a second name.

Eventually, all of the recommendation documents necessary for transfer were sent to Sgt. Bottini who provided them to Comm'r O'Toole.[14]  No one was selected for the position and it eventually expired.

---

[13] Defendants object to Maj. Howard and Col. Leyschock's statements as being hearsay. Because the two were employees of Defendant City, however, and were speaking within the scope of their relationship, their statements do not constitute inadmissible hearsay. Fed. R. Evid. 801(2)(C).

[14] Defendants, citing Comm'r O'Toole's deposition as support, dispute that Comm'r O'Toole ever received Capt. Coonce's recommendation to fill the position.  In response, Plaintiff, in part, cites to Sgt. Bottini's deposition in which he states that—once he got all the materials together—he provided the recommendation to the Commissioner.  (Sgt. Bottini's Deposition, Doc. No. 51-5, at 71).  The Court, drawing all reasonable inferences in favor of the Plaintiff for the purposes of summary judgment, will accept it as true that Comm'r O'Toole received the recommendation paperwork.

Between July and October 2017, Comm'r O'Toole approved detachments of sergeants from specialized units to the Second District for three to four weeks at a time to assist with the shortage of sergeants.  None of these sergeants had requested transfer.  Instead, Comm'r O'Toole's strategy was to pull specialized sergeants to avoid pulling sergeants away from districts because he did not want to sacrifice manpower from street work.  On October 2, 2017, however, Comm'r O'Toole did approve a transfer from the Fourth District for a sergeant—Sgt. McClain—who had returned from medical leave and could not work in the Fourth District because it required night duty.  Sgt. McClain was transferred to both accommodate her needs and help with the sergeant shortage.  Both Capt. Coonce and the Captain for the Fourth District approved of the transfer.

Following Sgt. McClain's transfer, there was still a shortage of sergeants in the Second District and a significant number of openings that could have been filled by a permanent transfer.  Plaintiff's transfer request was never acted upon.

## IV.    Plaintiff Is Not Selected to Fill the IAD Position

In August of 2017, there were open positions for sergeant investigators within the Internal Affairs Division.  Plaintiff submitted an application, was interviewed, and was selected to fill one of the four vacancies.  Before recommendations were sent to the Commissioner's office, however, Plaintiff and other applicants were advised on August 25, 2017, that the position would not be filled until at least November due to the District's manpower shortage and the need to retain officers in positions to work the streets.  All of the applicants were urged to reapply when the position was reposted.

On October 27, 2017, Plaintiff again submitted an application for a sergeant investigator position in IAD.  Plaintiff did not have to re-interview and was recommended to fill one of the four vacancies.  On November 21, 2017, the recommendations were provided to Sgt. Bottini who presented them to Comm'r O'Toole.[15]  Plaintiff, however, was transferred back to Intelligence on February 5, 2018, and she withdrew her application for the IAD position (which was not filled until March 7, 2018).  Upon her return to Intelligence, Plaintiff regained her TFO status and had her FBI credentials restored.  In total, Plaintiff spent about eight months in the Fifth District.

## SUMMARY JUDGMENT STANDARD

Federal Rules of Civil Procedure Rule 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "[T]he burden of demonstrating there are no genuine issues of material fact rests on the moving party," and the court must view "the evidence and the inferences which reasonably may be drawn [therefrom] in the light most favorable to the nonmoving party."  *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015).  "The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue

---

[15] Defendants, citing Comm'r O'Toole's deposition as support, dispute that Comm'r O'Toole was ever made aware that Plaintiff was recommended for the IAD position.  In response, Plaintiff cites to Sgt. Bottini's deposition in which he states that—once he got all the materials together—he provided the recommendations to the Commissioner.  (Sgt. Bottini's Deposition, Doc. No. 51-5, at 78-80).  The Court, drawing all reasonable inferences in favor of the Plaintiff for the purposes of summary judgment, will accept it as true that Comm'r O'Toole was made aware that Plaintiff was recommended for the position.

for trial.  The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in [her] favor on more than mere speculation[.]" *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (citations omitted).

## DISCUSSION

### I.     Title VII

### A. Sex Discrimination

Title VII prohibits discrimination in employment based on sex.  42 U.S.C. § 2000e–2(a)(1).  Because Plaintiff has not provided direct evidence of sex discrimination, the Court must analyze her claims under the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, Plaintiff has the initial burden of establishing that: (1) she was a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) there are facts that give rise to an inference of unlawful sex discrimination.  *Fiero v. CSG Systems, Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) (citing *Wells v. SCI Mgmt, L.P.*, 469 F.3d 697, 700 (8th Cir. 2006)).  Once Plaintiff establishes a prima facie case of discrimination, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  If Defendant articulates such a reason, Plaintiff must then demonstrate that Defendant's reason is a pretext for discrimination.  *Id.*

Here, Plaintiff argues that Defendant City of St. Louis discriminated against her by (1) transferring her out of Intelligence; (2) causing the revocation of her TFO status; and

15

(3) refusing to make her Capt. Coonce's administrative aid.[16]  (Plaintiff's Opposition, Doc. No. 50 at 33-34).  Defendant does not dispute that Plaintiff is a member of a protected class or that she was qualified for her job.  Instead, Defendant asserts that she has not made out a prima facie case of discrimination because she has failed to provide sufficient evidence that she suffered an adverse employment action or that she was discriminated against on the basis of her sex.  In the alternative, Defendant argues that— even if Plaintiff did establish a prima facie case of discrimination—they have provided legitimate, nondiscriminatory reasons for the allegedly adverse actions and inactions and that Plaintiff has failed to demonstrate that those reasons were pretextual.  Defendant further argues, specific to Plaintiff's allegation that Defendant City discriminated against her by causing the revocation of her TFO status, that it cannot be held liable because that decision was within the sole authority of the FBI.

## 1.  Plaintiff's Transfer Out of Intelligence

### Prima Facie Case

Plaintiff asserts that Capt. Deeba caused her to suffer an adverse employment action when, motivated by discriminatory animus, he requested her transfer out of Intelligence to the Fifth District.  Because Capt. Deeba was not the final decisionmaker

---

[16] Plaintiff did not allege that the refusal to make her Capt. Coonce's administrative aid was a discriminatory adverse action in her Charge.  However, Defendant City does not argue that Plaintiff failed to administratively exhaust her claims and have therefore forfeited the defense.  *See Fort Bend Cnty. Texas v. Davis*, 139 S. Ct. 1843, 1850-52 (2019) (holding that Title VII's charge-filing exhaustion requirement can be forfeited if not timely asserted by defendants because it "is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts.").

on the transfer and Plaintiff has not provided any evidence that Comm'r O'Toole approved the transfer due to sex-based animus,[17] it appears that Plaintiff is advancing a "cat's paw" theory of liability against Defendant City.  "Under this theory, 'an employer may be vicariously liable for an adverse employment action if one of its agents—other than the ultimate decision maker—is motivated by discriminatory animus and intentionally and proximately causes the action.'"  *Pribyl v. Cty. of Wright*, 964 F.3d 793, 797 (8th Cir. 2020) (quoting *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013) (citation omitted)).  In this situation, Plaintiff carries the burden to show that Capt. Deeba used Comm'r O'Toole "as a dupe in a deliberate scheme to trigger a discriminatory employment action."  *Id.*

At the outset, Plaintiff must first prove that her transfer to the Fifth District actually amounted to an adverse employment action.  "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage."  *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1131 (8th Cir. 2014) (quoting *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 955 (8th Cir. 2011)).  Examples of an adverse employment action include, but are not limited to, "[t]ermination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects."  *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 633 (8th Cir. 2016) (quoting *Spears v. Mo. Dept. of Corr. & Human Res.*, 210

---

[17] To the contrary, Plaintiff admitted that when this transfer took place Comm'r O'Toole had had no personal knowledge of her and had, instead, been told positive things about her performance.  (Plaintiff's Response to Material Facts, Doc. No. 51 ¶ 26).

17

F.3d 850, 853 (8th Cir. 2000)).  However, "not everything that makes an employee unhappy is actionable," including "minor or unpalatable changes in duties or working conditions." *Jackson v. Lew*, 242 F.Supp.3d 850, 865 (W.D. Mo. 2017) (citing *Duffy v. McPhillips*, 276 F.3d 988, 991-92 (8th Cir. 2002); and then *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007)).

Plaintiff admits that her transfer out of Intelligence to the Second District did not result in a loss of pay or rank.  (Plaintiff's Opposition, Doc. No. 50 at 33).  Instead, Plaintiff primarily asserts that the transfer was adverse because her position in Intelligence was a "high visibility" position, which gave her facetime with U.S. Attorneys and federal agency supervisors.  These networking opportunities, Plaintiff argued, were helpful during promotions and could elevate her career prospects.[18] (*Id.* at 32-33).  Plaintiff also briefly contends that the transfer was adverse because her job responsibilities in the Fifth District were limited to administrative tasks concerning personnel and supervising officers who were on patrol.  (*Id.* at 33).

Upon review, the Court finds that Plaintiff has failed to offer evidence which would allow a reasonable jury to conclude that her transfer out of Intelligence was an adverse action.  Plaintiff is correct that changes that cause harm to an employee's future

---

[18] In support for this argument, Plaintiff cites *Bonenburger v. St. Louis Metropolitan Police Department, et al.*, which held that defendant's decision not to promote an officer to a high-visibility position constituted an adverse employment action—even though the position came with no increase in rank or pay—because the plaintiff had provided evidence showing that the denied position provided greater chances for promotion.  956 F. Supp. 2d 1059, 1066-67 (E.D. Mo. 2013).

career prospects can amount to an adverse action.  *See Kelleher*, 817 F.3d at 633.

However, the Court agrees with Defendant City that Plaintiff has not submitted any

proof—other than her own statements—that the networking available in Intelligence

actually helped officers' future career prospects.  Plaintiff relies exclusively upon her

deposition testimony, (Plaintiff's Response to Defendant's Summary of Material Facts,

Doc. No. 51 at pp. 34-35), and these conclusory statements cannot create a genuine issue

of material fact for the purposes of summary judgment.[19] *Rose–Maston v. NME Hosps.,

Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998).  And, even to the extent they could, Plaintiff's

contention is undercut by her own deposition testimony.  Plaintiff herself admitted that

her transfer to the Fifth District did not cause any harm to her opportunities for

advancement:

> ATTORNEY:     Do you think that the eight months that you spent in the
>               Fifth District caused any long-term harm to your career
>               prospects?
>
> PLAINTIFF:    No.

 (Plaintiff's Deposition, Doc. No. 39-2, Tr. 151:24 – 152:2).

Plaintiff's second argument—that her transfer was adverse because her

responsibilities changed—likewise fails.  Assuredly, a transfer to a different position can

constitute an adverse employment action.  *See Shockency v. Ramsey Cty.*, 493 F.3d 941,

948 (8th Cir. 2007) (quoting *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 (8th Cir.

2000)).  However, where "an employee is forced to change positions, resulting in an

---

[19] Plaintiff exclusively cited her deposition testimony. (*See* Plaintiff's Response to
Defendant's Summary of Material Facts, Doc. No. 51 at pp. 34-35).

'alteration of job responsibilities,' the employee must still show a significant change in employment status" in order for the transfer to be actionable. *Williams v. True Mfg.*, No. 14-CV-1609 HEA, 2015 WL 4546618, at *3 (E.D. Mo. July 28, 2015) (quoting *Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006)).  Examples of when a change in responsibilities can amount to an adverse action include where an employee experiences a significant reduction in supervisory responsibilities or where the transfer results in "a considerable downward shift in skill level required to perform [the employee's] new job." *See Shockency,* 493 F.3d at 948; *Turner v. Gonzales*, 421 F.3d 688, 697 (8th Cir. 2005).

Here, the record reveals that Plaintiff's responsibilities in the Fifth District included: administrative upkeep of the personnel assigned to her, supervising officers on patrol, responding to Code 1 calls for service (which include robberies, assault first, homicide, home invasions), and reviewing and approving arrests.  Plaintiff does not argue that these job responsibilities were beneath her skill level or that she experienced a significant reduction in her supervisory role.  She does not explain why these responsibilities constituted a material deviation from the responsibilities she had in Intelligence, nor does she cite authority explaining why her change in working conditions would qualify as adverse.

Because Plaintiff has not shown that she suffered a significant alteration to her work responsibilities, and she experienced no change in salary or rank, the Court finds that no reasonable jury could find that Plaintiff's transfer rises to the level of a material change in employment necessary to demonstrate an adverse employment action.  *See Lloyd v. City of St. Charles*, No. 4:07-CV-01935- JCH, 2009 WL 485078, at *5 (E.D.

20

Mo. Feb. 26, 2009), *aff'd*, 360 F. App'x 713 (8th Cir. 2010) (holding that police officer's

transfer from the Detective Bureau to the Patrol Division was not an adverse employment

action, even though he was deprived of working on major criminal investigations,

because his dissatisfaction with his new responsibilities did not amount to a material

harm); *see also Duffy*, F.3d at 992 (noting that plaintiff's dissatisfaction with work

responsibilities was insufficient to establish an adverse action, because "not everything

that makes an employee unhappy is actionable adverse action" as "an adverse

employment action must effectuate a material change in the terms or conditions of . . .

employment").[20]

Without being able to show that her transfer was an adverse employment action,

Plaintiff has not established a prima facie case for discrimination.  As a result, Defendant

City is entitled to summary judgment on this alleged adverse employment action.

---

[20] The Court notes that, in her statement of facts, Plaintiff alleged other alterations to her
working conditions that occurred as a result of her being transferred out of Intelligence.
The changes that Plaintiff noted that had support in the record included: (1) having to
return her take-home vehicle; (2) changes to her schedule, including having to work
weekends; (3) not being able to work on investigations outside of St. Louis; and (4)
having to work in plain clothes.  Because Plaintiff did not mention any of these changes
in her argument against summary judgment, the Court does not address them.

However, even if the Court were to take into account these changes, it would not alter the
Court's holding, as many of those changes appear to be minor alterations of employment,
rather than material harms.  *See Breshears v. City of Little Rock*, No. 4:18-CV-00774-
LPR, 2020 WL 3477134, at *2 (E.D. Ark. June 25, 2020) (holding the conclusory
statement that losing a take-home vehicle was harmful—without concrete evidence
(monetary or otherwise) revealing the benefit of a take-home car—did not create a
reasonable inference that plaintiff suffered an adverse action); *Recio v. Creighton Univ.*,
521 F.3d 934, 940 (8th Cir. 2008) (finding that plaintiff, who was denied her preferred
working schedule, could not demonstrate she suffered an adverse action because she
presented no evidence that the denial resulted in significant harm).

## 2. **Plaintiff's Loss of Her TFO Status**

Plaintiff next asserts that Defendant City is liable because Capt. Deeba caused her to suffer an adverse employment action when, motivated by discriminatory animus, he commanded the FBI to revoke Plaintiff's TFO status.  (Plaintiff's Opposition, Doc. No. 50 at 33).  There are two issues with Plaintiff's argument, one foundational and one evidentiary.

First, Plaintiff's Title VII claim is solely against Defendant City.  Yet, Plaintiff has presented no evidence that Defendant City had the power to strip Plaintiff of her TFO status and did not respond to Defendant's contention that the authority to give or revoke FBI credentials lies solely with the FBI.  Plaintiff appears to make a strained cat's paw argument by asserting that Capt. Deeba—who does not have the power to revoke Plaintiff's TFO status—used the FBI as a conduit to trigger a discriminatory action against Plaintiff.  *See Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009) ("This circuit's 'cat's paw' rule provides that an employer cannot shield itself from liability . . . by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design.").

However, "the concept of cat's paw liability assumes that the person with the impermissible bias and the decision maker *both work for the defendant employer*, so that their actions are attributable to [the employer]." *Daniel v. Sargent & Lundy, LLC*, No. 09 C 7206, 2012 WL 874419, at *11 (N.D. Ill. Mar. 14, 2012) (emphasis added) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 420-21 (2011)).  Here, Plaintiff has not refuted that

22

the "ultimate decisionmaker" as to her TFO status would be someone within the FBI. Plaintiff fails to cite any authority (and the Court is aware of none) supporting a theory of liability in which an adverse employment action taken by a completely different entity— even if influenced by someone who works for her employer—can then be attributed to the employer.  On this basis alone, Defendant City would be entitled to summary judgment on this allegation.

To the extent that Defendant City could be liable for a decision of the FBI that resulted due to the animus of one of the City's employees, Plaintiff would still have to show that Capt. Deeba's animus was the proximate cause of Plaintiff losing her TFO status.  *See Pribyl*, 964 F.3d at 797.   Plaintiff claims that Capt. Deeba caused her to lose her TFO status by making phone calls to both Agent Lynch and Agent Lynch's supervisor during which he demanded that Plaintiff's TFO credentials be revoked. (Plaintiff's Opposition, Doc. No. 50 at 6-7).  Although there is evidence that Capt. Deeba did make phone calls to both Agent Lynch and Agent Lynch's supervisor, Plaintiff's understanding of the substance of those calls is rooted in both speculation and hearsay— neither of which can create a genuine issue of material fact.[21]  Further, the assertion that Capt. Deeba demanded the revocation of Plaintiff's TFO status is contradicted by the email he sent to Agent Lynch after their phone call.  (Capt. Deeba's Email to Agent

---

[21] Plaintiff has no firsthand knowledge about what was said on those calls, but states that—during a phone call with Agent Lynch—Agent Lynch told Plaintiff that Capt. Deeba was demanding the revocation of her status.  As discussed more thoroughly above, Agent Lynch's statements to Plaintiff are inadmissible hearsay and cannot be used to defeat summary judgment.  *See supra* note six.

Lynch, Doc. No. 51-13).  In that email, Capt. Deeba gave Agent Lynch the contact information of Plaintiff's new captain and informed Agent Lynch that she could ask the new captain for Plaintiff's help with ongoing cases.  As a result, the Court holds that no reasonable jury could find that Capt. Deeba was the proximate cause of the FBI revoking Plaintiff's TFO credentials and Defendant City is entitled to summary judgment on this claim.

### 3.  Plaintiff is Not Given the Role of Administrative Aid

Finally, Plaintiff argues that Defendant City discriminated against her when she was not made Capt. Coonce's administrative aid in the Second District.  (Plaintiff's Opposition, Doc. No. 50 at 34).  Plaintiff admits that the administrative aid position would not have increased her pay or her rank.  Instead, Plaintiff asserts that the denial of the position caused her to lose "access to more contacts and networking opportunities then she was being exposed to as a sergeant in District Five (5), since being an administrative aide is a high-profile position." (*Id.*).  Plaintiff argues that, as a result, she suffered harm to her career prospects—thereby making it an adverse action. (*Id.* at 34).

Plaintiff cites both to her and Capt. Coonce's deposition testimony to support her claim that being denied the administrative aid position hurt her career prospects. Although this testimony supports the assertion that the position was considered more "high profile" because it would have allowed for Plaintiff to be a liaison to City Hall and federal and state agencies, there is no testimony about why being denied these networking connections would "significantly affect" her future career prospects.  Plaintiff does not, for example, provide evidence that being denied these networking connections

24

was equivalent to being denied essential training or work-experience, or that officers in these positions were more likely to be promoted.  *See Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 675 (8th Cir. 2006) (finding plaintiffs suffered adverse employment actions where they provided evidence that they were denied work experience that was good preparation for promotional tests, which enhanced the ability for career advancement); *Bonenburger*, 956 F.Supp.2d at 1066-67 (finding plaintiff police officer suffered adverse employment action where he provided evidence that the "high-visibility position" he was not selected for "provide[d] greater chances for promotion").

Plaintiff's conclusory statements that being denied networking opportunities as Capt. Coonce's aid do not create a genuine issue of material fact for the purposes of summary judgment.  *Rose–Mastson*, 133 F.3d at 1109.  Moreover, this argument is again undercut by Plaintiff's testimony in which she specifically stated that the eight months she spent in the Fifth District did not cause any harm to her career prospects.  (Plaintiff's Deposition, Doc. No. 39-2, Tr. 151:24 – 152:2).  As a result, the Court finds that no reasonable trier of fact could find that Plaintiff suffered an adverse employment action based on this claim.

In summation, Defendant City is entitled to summary judgment on all of Plaintiff's Title VII sex discrimination claims.

## B. Retaliation

Title VII also prohibits employers from retaliating against employees who oppose unlawful discrimination. 42 U.S.C. § 2000e-3(a).  Similar to a discrimination claim under Title VII, a retaliation allegation follows the familiar *McDonnell Douglas* burden-shifting

framework.  To establish a prima facie case of retaliation, plaintiff must prove (1) she

engaged in protected activity; (2) she suffered a materially adverse employment action;

and (3) but for her protected activity, the defendant would not have taken the action

against her.  *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013).  Once

proven, the burden then shifts to Defendant City to articulate a legitimate, non-retaliatory

reason for the adverse action.  *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015).   If

Defendant manages to do so, then Plaintiff carries the burden to put forward evidence of

pretext.  *Id.*

Here, Plaintiff argues that Defendant City of St. Louis retaliated against her by (1)

never acting upon her request to be transferred to the Second District; (2) not selecting

her for the posted detective sergeant position in the Second District; and (3) not selecting

her for the position in IAD.[22]  (Plaintiff's Opposition, Doc. No. 50 at 39).  In response,

Defendant asserts that Plaintiff has not made out a prima facie case of retaliation because

she has failed to provide sufficient evidence that she suffered an adverse employment

action or that the actions (or, inactions) complained of were causally connected to her

Charge.  In the alternative, Defendant argues that—even if Plaintiff did establish a prima

---

[22] Plaintiff did not allege retaliation (or any of these adverse actions) in her Charge.
However, Defendant City did not assert exhaustion as a defense in their summary
judgment briefing and have, thus, waived the argument.  *Fort Bend*, 139 S. Ct. at  1851;
*see Francisco v. Cooper Tire & Rubber Co.*, No. 4:19-CV-4058, 2019 WL 3937638, at
*3 (W.D. Ark. Aug. 20, 2019) ("A plaintiff's failure to comply with the Title VII charge-
filing requirement has no impact on a district court's subject matter jurisdiction.  As such,
the Court has subject matter jurisdiction to hear Plaintiff's retaliation claim, even if the
Court assumes *arguendo* that [she] did not exhaust h[er] administrative remedies on that
claim.").

facie case of retaliation—it has provided legitimate, nondiscriminatory reasons for the allegedly adverse actions and Plaintiff has failed to demonstrate that those reasons were a pretext.

1.  **Whether Individually, or Cumulatively, Defendant's Alleged Retaliatory Conduct Amounted to An Adverse Action**

Under Title VII, what constitutes an "adverse employment action" in a retaliation claim is a broader inquiry than in the discrimination context. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 66 (2006) (holding that Title VII provides "broader protection for victims of retaliation" than for "victims of discrimination"). That is because the retaliation adverse action requirement covers not only an employer's actions that affect employment or alter the conditions of the workplace, but other adverse actions as well. *Id.* Nevertheless, the adverse actions must be "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57.

In assessing a retaliation claim, courts are instructed to be mindful that "context matters" in determining what acts are likely to dissuade employees from complaining of discrimination. *Id.* at 69-70. As a result, the Eighth Circuit has found that, in some circumstances, "it is proper to consider the cumulative effect of an employer's alleged retaliatory conduct" to determine whether an adverse action has taken place. *Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1083-84 (8th Cir. 2010) (citing *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 788 (8th Cir. 2007), abrogated on other grounds by *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)).

27

Here, Plaintiff appears to argue that the three alleged retaliatory actions had a cumulatively adverse impact on her.  (Plaintiff's Opposition, Doc. No. 50 at 38). Plaintiff's argument is as follows:

> Here, after filing a Charge of Discrimination, Plaintiff was denied each and every position for which she applied and transfer which she requested.  She was more than qualified for each position to which she applied and was recommended for those positions by her supervisors, yet did not receive any of the positions.  All of the positions to which she applied had benefits of employment available that were not available in her assignments to District Five (i.e. take-home car, straight time, higher profile, networking opportunities, and career development).  A reasonable person in Plaintiff's position would be dissuaded from filing a charge of discrimination due to the actions of [Defendant].

(*Id.*).  The Court will therefore analyze whether Defendant City's alleged conduct— independently, or taken together—would dissuade a reasonable person from filing a charge of discrimination.

### Inaction on Plaintiff's Request to be Transferred to the Second District

Plaintiff argues that Defendant City retaliated against her by not acting on the electronic request that she made to transfer out of the Fifth District and into the Second District.  However, Plaintiff has presented no evidence suggesting that Defendant's failure to act upon the request was harmful.  Plaintiff admits the transfer did not come with a change in rank or salary, and Plaintiff has not provided any evidence that it would have provided her with a take-home car, a better schedule, or better career prospects.  The request appears to be for a purely lateral transfer—from one district to another district – the denial of which does not amount to an adverse employment action.  *Breshears*, 2020 WL 3477134, at *9 ("In short, a failure to transfer that would not have resulted in a

promotion 'in form or substance, cannot rise to the level of a materially adverse employment action.'" (quoting *Charleston v. McCarthy*, 926 F.3d 982, 990 (8th Cir. 2019))).  As a result, the Court concludes there is no evidence that the failure to act on Plaintiff's transfer request, taken alone, could amount to an actionable adverse action.

### Not Making Plaintiff a Detective Sergeant in the Second District

 Plaintiff next argues that Defendant City retaliated against her by not selecting her for a Detective Sergeant position in the Second District.  Plaintiff admits that the position would not have come with a change in pay or rank and presents no evidence that the Detective Sergeant position came with a better schedule or a take-home car.  Plaintiff's remaining argument, that the failure to be given this position harmed opportunities for her advancement, is unsupported and is again directly refuted by her own deposition testimony in which she stated the eight months she spent in the Fifth District did not harm her career prospects. (*See* Plaintiff's Deposition, Doc. No. 39-2, Tr. 151:24 – 152:2).

Moreover, the Court notes that Defendant City has presented evidence showing that the position was not, in fact, vacant when Plaintiff applied.  The record reflects that a detective sergeant in the Second District was out on sick leave and that it was well known that the Detective was going to use that sick leave until his retirement months later.  Knowing this, Capt. Coonce requested that she be able to post the detective sergeant position in order to help with the shortage of manpower in her district.  The immediate members up her chain of command agreed and sent the position to be posted by human resources.  There is no evidence that the posting of this position was approved by the Commissioner's office, and the parties do not dispute that the detective sergeant could

not be transferred out of his position while he was on sick leave.  In short, the detective
sergeant position was posted even though there was no actual vacancy.

Plaintiff  appears to argue that even though there was no actual vacancy, it was an
adverse action for Comm'r O'Toole not to create a new detective sergeant position in the
Second District for Plaintiff to fill.  However, this is contrary to Eighth Circuit precedent,
which has found that an employer's failure to create a position for an employee does not
constitute a materially adverse action.  *See AuBuchon v. Geithner*, 743 F.3d 638, 643 (8th
Cir. 2014) (holding, in the context of a Title VII failure to promote case, it was not an
adverse action for an employer to fail to create a position to which the complaining party
could be promoted).  As such, even to the extent that there were material benefits to a
detective sergeant position, Plaintiff has not shown that being denied a position with no
vacancy would amount to a material harm.

### Not Selecting Plaintiff for a Position in IAD

Finally, Plaintiff asserts that Defendant City retaliated against her when it did not
select her to fill a vacancy within IAD.  Again, Plaintiff admits that the position did not
come with a change in pay or rank.  Rather, she argues "that her career prospects were
damaged as a result of being denied the sergeant investigator position, since the position
would have had more responsibilities and duties than those she had in the Fifth District."
(Plaintiff's Opposition, Doc. No. 50 at 15).  Plaintiff, again, does not provide any
evidence that being denied the IAD position harmed her career prospects.  The only
citation Plaintiff provides to the record is to her own deposition testimony, in which she
vaguely mentions that the position "would allow [her] more duties and responsibilities as

a supervisor." (Plaintiff's Deposition, Doc. No. 51-1, Tr. 133:4-11). Those duties and responsibilities are not explained, nor is there any explanation as to how those duties and responsibilities translated into opportunities for advancement. Plaintiff's conclusory statements that being denied "duties and responsibilities" harmed her career prospects cannot create a genuine issue of material fact for the purposes of summary judgment. *See Rose–Mastson*, 133 F.3d at 1109. Moreover, the assertion that she suffered a material harm to her career prospects is again contradicted by her own testimony. (Plaintiff's Deposition, Doc. No. 39-2, Tr. 151:24 – 152:2).

Plaintiff also makes conclusory statements that being denied the position in IAD was adverse because, if she would have been selected, she would have had the opportunity to work on "sensitive investigations" and would have had the ability to work "straight days, [with] weekends off." (Plaintiff's Opposition, Doc. No. 50 at 15). Plaintiff does not explain why the opportunity to engage in "sensitive investigations" would so change the circumstances of her employment that the denial of the position would amount to a material harm. *See Lloyd*, 2009 WL 485078, at *5 (holding that a police officer's dissatisfaction that he was denied certain investigations did not, without more, rise to the level of an adverse action). She similarly does not explain why being denied a position that works straight weekdays was a nontrivial harm. *See Recio*, 521 F.3d at 940 (finding that plaintiff, who was denied her preferred working schedule, could not demonstrate she suffered an adverse action because she presented no evidence that the denial resulted in significant harm). Because Plaintiff relies solely on her conclusory assertions that Defendant City's failure to select her for the position resulted in a material

31

harm, the Court concludes that there is no evidence that can lead a rational jury to find that it amounted to an actionable adverse action.

## Cumulative Impact

Plaintiff asserts that, cumulatively, the fact that she was not selected for any of the foregoing positions is sufficient evidence that a reasonable person in Plaintiff's position would have been dissuaded from filing a charge of discrimination.  The Court does not agree.  Although seeing the whole picture is of import in retaliation cases, the wrongs that Plaintiff complains of are ultimately immaterial, unsubstantiated, or controverted by her own testimony.  As such, even taken as a whole, the actions (and inactions) of Defendant "do not constitute systematic retaliation capable of transforming otherwise lawful conduct into unlawful, retaliatory employment action."  *Fercello* 612 F.3d at 1084 (holding, in part, that the aggregate of defendant's conduct could  not establish retaliation because the complained of slights were too "petty" or "unsubstantiated").  Accordingly, Plaintiff cannot establish a prima facie case of retaliation and Defendant is entitled to summary judgment.

### 2.  Whether Plaintiff Has Established Pretext

Even if Plaintiff established a prima facie case of retaliation, Defendant City would nevertheless be entitled to summary judgment because Plaintiff has failed to show that Defendant City's legitimate, non-discriminatory reasons for these actions were pretext for unlawful retaliation.  Plaintiff's burden in showing pretext requires more substantial evidence than establishing a prima facie case.  *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005).  To establish pretext, Plaintiff  "must both

discredit defendants' asserted reasons for [the adverse actions] and show that the circumstances permit drawing a reasonable inference that the real reason for [the adverse actions was] retaliation."  *Hutton v. Maynard*, 812 F.3d 679, 684 (8th Cir. 2016) (citing *Gilbert  v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 918 (8th Cir. 2007)).  Such circumstances may include instances when the employer "(1) failed to follow its own policies, (2) treated similarly[ ]situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 904 (8th Cir. 2015).  Evidence of pretext and retaliation "is viewed in light of the employer's justification."  *Logan*, 416 F.3d at 881.

### Inaction on Plaintiff's Request to be Transferred to the Second District

Less than two weeks after Comm'r O'Toole was put on notice of Plaintiff's Charge, Plaintiff requested transfer from the Fifth District to the Second District by submitting an electronic request on PeopleSoft.  Plaintiff's request was never acted upon, and Plaintiff eventually withdrew the request after being transferred back to Intelligence. Defendant City argues that Comm'r O'Toole never acted upon Plaintiff's electronic request to be transferred to the Second District for a simple reason: he was never made aware of her request to be moved because he never saw the electronic request, nor was he informed that it existed.  Moreover, Defendant City argues that—even if Plaintiff's request had come to Comm'r O'Toole's attention—the request would have been denied because, at that time, only officers from specialized units were being detached to the Second District.

Plaintiff attempts to undermine Defendant City's justification for its inaction by pointing out that the PeopleSoft entries for transfer are compiled into a weekly report that is then provided to members of command.  (Plaintiff Opposition, Doc. No. 50 at 39).  She further argues that retaliatory animus was the but-for cause of the inaction as shown by the temporal proximity between her Charge and the filing of her request to transfer, as well as the fact that Comm'r O'Toole had allowed for several detachments of officers to the Second District who had, unlike Plaintiff, not requested transfer.  (*Id.*).  Plaintiff does not address the legitimacy of Comm'r O'Toole's strategy for why he pulled these employees, however.

The record reflects that Plaintiff submitted an electronic request for a transfer and that she informed Capt. Coonce that she had made the request.  However, Plaintiff did not submit a formal request for transfer—which involved submitting a memorandum up her chain of command—and there is no evidence that she brought the request for transfer to anyone's attention beside Capt. Coonce.  Although Plaintiff has provided evidence that Comm'r O'Toole had access to the PeopleSoft entry reports, she has provided nothing other than her own speculation that he reviewed the report, saw she had requested a transfer, and then purposefully ignored her request.  Plaintiff's speculation is insufficient to rebut Comm'r O'Toole's testimony that he had no knowledge of Plaintiff's request. *See Mann*, 497 F.3d at 825.

Plaintiff's second argument, that Comm'r O'Toole's failure to act on her request was more likely retaliatory because he was detaching and transferring other employees to the Second District, is likewise unconvincing.  Even to the extent Comm'r O'Toole knew

of Plaintiff's request, his decision to detach and transfer other employees is only indicative of retaliatory animus if those employees were similarly situated to Plaintiff. *See Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir.2014) (explaining that one of multiple ways to prove pretext is to show "that similarly situated employees who did not engage in the protected activity were treated more leniently"). Plaintiff has not provided any evidence that the employees who were detached or transferred were similarly situated to her; in fact, the record reveals significant, relevant differences. Specifically, the only officers who were detached to the Second District, with the exception of one officer who needed to be moved because of a medical need, belonged to specialized units who (if detached) would not cause a street work shortage in another district. Plaintiff did not have a medical condition justifying transfer or belong to a specialized unit. As such, the fact that these other officers were transferred does not support a finding of pretext. *Hutton v. Maynard*, 812 F.3d 679, 685 (8th Cir. 2016) (finding no showing of pretext where plaintiff provided "no explanation as to why or how the named individuals were in any way similarly situated such that they should be considered valid comparators"). To the contrary, the fact that only officers from the specialized units were pulled, with one notable exception, only serves to bolster Defendant's legitimate, nondiscriminatory justification for why Plaintiff would not have been transferred even if Comm'r O'Toole had been made aware of her request.

In sum, despite the temporal proximity between her request to transfer and the filing of her Charge, Plaintiff has not provided sufficient evidence to establish pretext. She has not provided evidence showing that Comm'r O'Toole was ever made aware of

her request, which means she is unable to show that her Charge was the but-for cause of the inaction on her request for transfer.  Moreover,  even to the extent that Comm'r O'Toole having access to the PeopleSoft reports could create a triable issue of fact as to whether he was aware of her request, Plaintiff has not refuted that the only employees who were detached or transferred were not similarly situated to her.  The treatment of these employees, thus, does not create a reasonable inference of pretext.

### Not Making Plaintiff a Detective Sergeant in the Second District

Two months after filing her Charge, Plaintiff was not selected to become a detective sergeant in the Second District.  Defendant City asserts that Plaintiff was not selected to fill the job opening because the position was not actually vacant and had, in fact, been posted in error.  As a result, Comm'r O'Toole allowed for the position to expire without filling it.

Plaintiff asserts this reason is pretextual because Comm'r O'Toole had the ultimate authority to assign personnel to a different district even if that meant that the district would then have more than the authorized number of officers assigned to it. Plaintiff, as proof that this was pretext, points to the fact that another sergeant was transferred into the Second District even though her transfer put the district "one over." (Plaintiff's Opposition, Doc. No. 50 at 39).  Plaintiff contends that Comm'r O'Toole's failure to create a spot for her, even though he had the power to do so, was thus motivated by retaliatory animus.

Plaintiff's evidence that Comm'r O'Toole had the authority to create positions and move more than the authorized number of people into a district at his discretion does not

discredit the fact that there was no vacancy.  Further, Plaintiff's comparator evidence fails to raise a reasonable inference that the but-for cause for her not being selected was due to retaliatory animus.  Plaintiff and the sergeant who was transferred were not similarly situated because they were different in one very important, relevant respect: the sergeant who was ultimately transferred to the Second District had to be transferred for medical reasons.  Plaintiff had nothing, medical or otherwise, that required her transfer to the Second District; thus, her comparator evidence fails to support a finding of pretext. *See Ebersole*, 758 F.3d at 925 (8th Cir. 2014) (comparator evidence must involve the better treatment of a similarly situated employee).  Because the evidence Plaintiff submitted does not create a reasonable inference that the but-for cause of her not receiving the position was retaliation, she fails to establish pretext.

### Not Selecting Plaintiff for a Position in IAD

Finally,  Plaintiff argues that Defendant City retaliated against her by not selecting her for a position in IAD.  Defendant City argues that Plaintiff was not selected to fill one of the four vacancies because, while her application was pending, there were major manpower shortages that prevented the position from being filled.  By the time the positions could be filled, Defendant City asserts it could not select Plaintiff for one of the positions because she had voluntarily withdrawn her application from consideration.

Plaintiff argues that Defendant's argument that a severe manpower shortage prevented the positions from being filled is pretext.  Plaintiff does not dispute that there was a severe manpower shortage, but rather points to the fact that Comm'r O'Toole had been presented with the recommendation for Plaintiff  to fill one of the vacancies in

November 2018.  Plaintiff theorizes that Comm'r O'Toole approved the posting of the

position but, when confronted with the fact that Plaintiff was recommend for the position,

declined to fill any of the vacancies in order to retaliate against her.  Plaintiff admits that

she withdrew her application, but does not discuss how that should impact the Court's

analysis.

Again, Plaintiff provides no evidence that discredits Defendant's justification that

there was a severe manpower shortage on the streets that prevented positions in IAD from

being filled.  Moreover, Plaintiff's assertion that Comm'r O'Toole's retaliatory animus

was the true reason the positions were not filled while her application was pending, is

conclusory and not supported by the record.[23]  Ultimately, Plaintiff has not carried her

burden to show that retaliatory motive, rather than the well documented manpower

shortage and her decision to withdraw her application, was the but-for cause of her not

being selected for the IAD position.  As such, she has failed to create a reasonable

inference of pretext.

---

[23] Lieutenant Adam Koeln, who was responsible for interviewing for the IAD positions, informed applicants on August 25, 2017, that the positions were not going to be filled because of manpower shortages.  *See* August Email from Lt. Koeln, Doc. No. 39-24). This email predated Comm'r O'Toole being provided with Lt. Koeln's recommendation that Plaintiff fill one of the four vacancies.  In March 2018, when Lt. Koeln emailed his updated list of recommendations for the positions, he noted, "Prior to filling any of the vacancies in the Internal Affairs Division due to man power shortages, Sergeants Boone and Clayborn-Muldrow indicated that they would like to withdraw their names from consideration from the open position." (*See* March Email from Lt. Koeln, Doc. No. 29-11).  These two emails substantiate that the reason the positions were not filled was due to manpower shortages.

For the foregoing reasons, Defendant City is entitled to summary judgment on Plaintiff's Title VII sex retaliation claim.

## II.    Missouri Human Rights Act

Under 28 U.S.C. § 1367, in any civil action in which a district court has original jurisdiction, it shall also have supplemental jurisdiction over all claims so related to the claims in the original jurisdiction that form part of the same case or controversy.  Once a federal court has dismissed all claims over which it had original jurisdiction, it has the discretionary power to decline the exercise of supplemental jurisdiction over the remaining state law claims.  *Steed v. Mo. State Highway Patrol*, No. 4:17-CV-1440 HEA, 2020 WL 2615633, at *11 (E.D. Mo. May 22, 2020).  In these circumstances, district courts ordinarily dismiss the state law claims without prejudice "to avoid needless decisions of state law . . . as a matter of comity."  *Gregoire v. Class*, 236 F.3d 413, 419-20 (8th Cir. 2000) (quoting *ACLU v. City of Florissant*, 186 F.3d 1095, 1098-99 (8th Cir.1999) (internal quotations omitted)).  Because "[t]he judicial resources of the federal courts are sparse compared to the states," the Eighth Circuit has routinely emphasized "the need [for district courts] to exercise judicial restraint and avoid state law issues wherever possible." *Id.* at 420. (quoting *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir.1990)).

Having granted Defendant City summary judgment on the federal claims against it, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims against Defendant City and Defendant Deeba and will dismiss those claims without prejudice.  *See* 28 U.S.C. § 1367(c)(3); *Ivy v. Kimbrough*, 115 F.3d 550, 552-53

(8th Cir. 1997) ("In most cases, when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, the pendent state claims are dismissed without prejudice to avoid needless decisions of state law … as a matter of comity and to promote justice between the parties.") (citation omitted).

## CONCLUSION

For these reasons, the Court finds and concludes that Defendant City is entitled to summary judgment on Plaintiff's Title VII claims.  Because the Court has dismissed the federal claims against Defendant City, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims against Defendant City and Defendant Deeba.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion for Summary Judgment is **GRANTED** as to Plaintiff's Title VII Claims.  (Doc. No. 38).

**IT IS FURTHER ORDERED** that Plaintiff's remaining state law claims are **DISMISSED** without prejudice.  A separate Judgment will accompany this Memorandum and Order.


AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 11th day of September, 2020.

40